## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

CRAIG T. STANBERRY,     )
                               )
           Plaintiff,     )
                               )
        v.              )     No. 18-cv-3212
                               )
ANDREW SAUL,[1]     )
Commissioner of Social Security,     )
                               )
          Defendant.     )

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Craig T. Stanberry appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  On August 21, 2013, Stanberry filed this application.  Stanberry alleged he became disabled on June 11, 2011.  Certified Transcript of Proceedings before the Social Security Administration (d/e 8) (R.), 515.  The Commissioner previously denied the application, and Stanberry brought an action for judicial review.  Stanberry v. Berryhill, C.D. Ill. Case No. 17-3065 (2017 Action).  Pursuant to the

---

[1] Andrew Saul has been appointed as Commissioner of Social Security.  As such, he is automatically substituted in as the proper party defendant in this case.  Fed. R. Civ. P. 25(d).

parties' stipulation in the 2017 Action, R. 609-10, this Court reversed and remanded the case for further proceedings before the Commissioner.  R. 608-09, 2017 Action, Order entered October 19, 2017 (Case No. 17-3065 d/e 14).  The Commissioner again denied Stanberry's application, and Stanberry has brought this action for judicial review.  Stanberry filed a Motion for Summary Judgment (d/e 10).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 14).  This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be AFFIRMED.

## STATEMENT OF FACTS

Stanberry was born on August 7, 1970.  He completed high school, including some vocational training in graphic arts.  Stanberry previously worked as a truckdriver and laborer.  Stanberry suffers from lumbar degenerative disc disease, right knee degenerative joint disease, history of compartment syndrome, status post right leg surgery, affective disorder, anxiety disorder, and history of attention deficit disorder (ADD).  The last date on which Stanberry was insured for Disability Benefits was December 31, 2016 (Date Last Insured or DLI).  R. 223, 516, 518, 527.

On September 29, 2010, Stanberry saw his primary care physician Dr. George Geranios.  Stanberry was 72 inches tall and weighed 297 pounds.  On examination, Stanberry had lumbar spine tenderness.  R. 305.

On November 17, 2010, Stanberry saw Dr. Geranios for a follow up. Stanberry wanted an increased dosage in his pain medication.  On examination, Stanberry had tenderness in his lumbar spine, his neurological system was normal, and his gait and stance were normal.  Dr. Geranios recommended walking 10 minutes a day and weight loss.  R. 309.

On April 28, 2011, Stanberry saw Dr. Geranios with complaints of numbness in his left thumb and fourth finger.  On examination, Stanberry's left hand was tender on palpation.  Stanberry's neurological system was normal, and his gait and stance were normal.   Dr. Geranios prescribed a brace for Stanberry's left wrist to be used at night.  He also recommended walking 10 minutes a day and losing weight. R. 314-15.

On June 16, 2011, Stanberry saw Dr. Geranios for back pain. Stanberry reported that he was on administrative leave from work.  He said he worked too hard on the previous Tuesday and developed low back pain. R. 316.  On examination, Stanberry had tenderness on palpation in his lumbar spine.  Stanberry's neurological system was normal and his motor

strength was normal.  Dr. Geranios recommended walking 10 minutes a day and losing weight.  R. 317.

On June 30, 2011, Stanberry saw Dr. Geranios.  Stanberry reported that he was walking better but still sore.  Stanberry said his employer terminated his employment.  On examination, Stanberry's lumbar spine was tender to palpation.  Stanberry's neurological system was normal, and his motor strength was normal.  Dr. Geranios noted that Stanberry had a depressed mood.  Dr. Geranios recommended a 10 minute walk every day and weight loss.  Dr. Geranios also recommended rest and stretching exercises.  R. 319-20.

On August 29, 2011, Stanberry saw Dr. Geranios.  Stanberry reported that his back was doing "a lot better."  R. 321.  On examination, Stanberry's lumbar spine was still tender to palpation.  His neurological systems were normal, and his muscle strength was normal.  Dr. Geranios recommended an exercise program and a referral to a chiropractor.  R. 322.

On October 12, 2011, Stanberry saw Dr. Geranios.  Stanberry reported that he was still having problems with his lower back.  On examination, his lumbosacral spine was tender to palpation.  Stanberry's neurological system was normal.  Dr. Geranios recommended a 10-minute

walk every day.  Dr. Geranios referred Stanberry to neurosurgeon  Dr. Margaret McGregor, M.D.  R. 324, 481.  Dr. Geranios also ordered an MRI of Stanberry's lumbar spine.  R. 507.

On October 20, 2011, Stanberry had an MRI of his lumbar spine. The MRI showed mild to moderate spinal stenosis at L4-L5 and L5-S1 related to degenerative disc disease.  Stanberry also had a bulge at L4-L5 in contact with the S1 nerve root sleeve in the spinal canal.  R. 507.

On December 5, 2011, Stanberry saw neurosurgeon Dr. McGregor. Stanberry said he felt better since he had been off work.  Stanberry reported that he had pain in his low back when he walked or engaged in other activities.  He said that the pain radiated into his right leg with occasional numbness in the bottom of his right foot.  He reported that he previously had two epidural spinal injections, but the injections made his pain worse.  He said the pain started on June 6, 2011 when he lifted materials at work.  Stanberry also reported tingling on the bottom of his right foot but no numbness or burning.  Stanberry reported that the chiropractor helped, but he stopped going because the sessions were too expensive.  R. 481.  Dr. McGregor reviewed the MRI and assessed lumbar disc degeneration.  Dr. McGregor prescribed physical therapy.  R. 483.

A year later, on January 19, 2012, Dr. McGregor completed a medical questionnaire from the Illinois Department of Human Rights.  R. 493-95.[2] Dr. McGregor indicated that Stanberry's condition was transitory and the long-term effects were unknown.  Dr. McGregor opined that Stanberry's condition could get worse.  Dr. McGregor indicated that Stanberry's condition was not insubstantial because he had a disc bulge.  Dr. McGregor said that she had not restricted Stanberry from working.  Dr. McGregor indicated that Stanberry's prognosis had changed since she started treating him.  She said that Stanberry reported constant pain but better strength.  R. 494-95.

Another year later, on May 9, 2013, Stanberry saw neurosurgeon Dr. Jose Espinosa. M.D.  Stanberry reported having lower back pain since 2002.  The pain had subsided but reappeared three years ago.  He said the pain intermittently shot down his right leg.  R. 299.  Dr. Espinosa said the MRI showed degenerative changes that were worse at L5-S1 and moderate at L4-L5.  On examination, his strength was well-preserved in his trapezius and sternocleidomastoid muscles, and he had full power in his extremities with normal tone and bulk.  Stanberry's gait was not antalgic.

---

[2] Stanberry filed a charge against his former employer of employment discrimination because of his medical condition with the Illinois Department of Human Rights. R. 493.

His reflexes were symmetrical.  Dr. Espinosa ordered x-rays.  R. 299.  The x-rays of the lumbar spine showed degenerative changes with minimal osteophytosis; the discs were preserved; and the alignment was good in flexion and extension.  R. 297.  Dr. Espinosa told Stanberry he had to quit smoking before Dr. Espinosa would perform surgery on Stanberry.  Stanberry also needed to have the hospital approve him for Charity Care or secure some other means to pay for any surgery.  R. 299.

On July 1, 2013, Stanberry saw Dr. Chad Johnston, M.D.  Dr. Johnston was Stanberry's primary care physician at this time.  R. 344-46.  Stanberry said that his back pain was controlled.  Stanberry said he and Dr. Espinosa decided to do facet blocks in the near future.  R. 344.  On examination, straight leg testing was negative bilaterally, Stanberry's sensory examination and reflexes were normal.  Stanberry's strength was normal and his range of motion of the spine was normal.  Dr. Johnston renewed Stanberry's medications.  R. 345-46.

On October 3, 2013, Stanberry saw Dr. Johnston for a three-month follow up.  Stanberry reported that he was very pleased with Dr. Espinosa's intervention in his back.  Stanberry said he still could not do manual labor like he could before his back pain started.  R. 347.  On examination, Stanberry's upper extremity strength was full and symmetrical.  Stanberry

had no abnormalities in his gait and had no neurological deficits.  R. 348-49.

On October 14, 2013, Stanberry completed a Function Report-Adult form.  R. 241-49.  Stanberry said he could not work because he had constant pain and weakness in his lower back.  He could not "perform manual labor or lift heavy things."  R. 241.  Stanberry said that he could not stand or sit for more than 20 minutes.  He also said that his anxiety and ADD caused him to be distracted easily and significantly interfered with his ability to communicate with superiors, co-workers, and the general public.  R. 241.

Stanberry said he performed "normal parenting stuff" to care for his two children.  R. 241-42.  During a typical day, he made sure his children got up and ready for school, took his son to school at 8:00 a.m. and his daughter to school at 9:00 a.m., took a shower, prepared dinner for the family, and picked his children up after school.  Once at home, he made sure the children did their homework and he finished preparing dinner.  The family ate dinner when his wife got home from work, about 6:00 p.m.  He helped clean up after dinner and watched television until bedtime. Stanberry also said that on a daily basis, he read, played videogames, watched television, and played guitar.  Stanberry said that he regularly

talked to relatives over the computer and visited with friends who came over to visit.  R. 245.

Stanberry said his back pain interfered with his sleep.  He had difficulty getting to sleep and staying asleep.  His back pain made some personal care difficult:  he had trouble putting on socks and shoes, bathing, shaving, and using the toilet.  R. 242.

Stanberry said that on a daily basis, he made sandwiches for lunch and one-course dinners for his family.  He spent 10-15 minutes making lunch and one to two hours making dinner.  Stanberry also loaded and unloaded the laundry.  He needed help carrying the laundry up and down stairs.  Stanberry went outside five to 10 times a day.  He went out alone. He drove.  Stanberry shopped one to two times a month for personal care items and other household items.  Each trip took 30 minutes to an hour.  R. 243-44. Stanberry's wife paid the bills.  Stanberry said that she was better at handling the bills because he would get frustrated and confused "when dealing with deadlines and get overwhelmed."  R. 244.

Stanberry said his impairments limited his ability to lift, squat, bend, stand, walk, sit, kneel, and climb stairs.  He said his impairments also affected his memory, his ability to complete tasks, and his concentration. Stanberry opined that he could not lift more than 25 pounds; he could walk

about two blocks before he had to rest; he could pay attention for 30 minutes; and he did not finish what he started.  R. 246.  Stanberry said that he could not kneel for more than two minutes or stand for more than 15 minutes.  R. 248.

Stanberry said he could follow written instructions "fairly well," but he had to concentrate and re-read the instructions several times.  He could follow spoken instructions "fairly well" depending on how clearly the instructions were given.  Stanberry said he had problems getting along with teachers, but not bosses or landlords.  He could not handle stress or changes in routine very well.  R. 246-47.

On November 11, 2013, Stanberry saw state agency psychologist Dr. Dolores Trello, Psy.D., for a consultative examination.  R. 350-55.  Stanberry reported that he suffered from ADD with hyperactivity, depression, anxiety, and panic attacks.  Stanberry reported that he took the children to school, occasionally cooked meals, did laundry, and did his own self-care.  He said he could drive.  Dr. Trello noted that his concentration was adequate.  R. 351-52.  On examination, Stanberry exhibited normal speech and affect.  His memory seemed intact.  He seemed well-informed.  He could perform simple mathematical problems except that he had

difficulty with multiplying single digits.  He attempted to provided abstract meanings for proverbs and solutions to hypothetical situations.

Dr. Trello diagnosed ADD with hyperactivity; panic attacks without agoraphobia; and depressed, anxious mood with chronic pain from medical conditions.  Dr. Trello assessed a Global Assessment of Functioning (GAF) score of 50, and "Serious problems in vocational functioning."  R. 353-54.

A GAF score was a measure of a clinician's judgment of an individual's overall level of functioning on a hypothetical continuum of mental health and illness.  American Psychiatric Assn, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.) (DSM IV-TR), at 32-35.  A GAF score of 41 to 50 indicated either serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM IV-TR, at 34.  The American Psychiatric Association no longer recommends use of the GAF score.  Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16.

On November 16, 2013, state agency psychologist Dr. Larry Kravitz, Psy.D. prepared a Psychiatric Review Technic and Mental Residual Functional Capacity Assessment of Stanberry.  R. 88-90, 92-94.  Dr. Kravitz opined that Stanberry's mental impairments caused mild restrictions of activities of daily living; mild difficulties in maintaining social functioning

and concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration.  R. 89.  Dr. Kravitz opined that Stanberry retained the capacity to understand, remember, and carry out simple and some detailed work tasks.  R. 90.  Dr. Kravitz opined:

> Claimant is able to understand and remember simple and some detailed instructions. However, his difficulties at times with focus and panic symptomatology would limit claimant carrying out and persisting to completion only simple, repetitive tasks consistently. Claimant would be capable of customary superficial workplace contacts. Claimant would do best with a relatively static work environment where the task expectations were straightforward and posed no more than ordinary levels of day-to-day work stress.

R. 94.

On November 20, 2013, Stanberry saw state agency physician Dr. Vittal Chapa, M.D., for a consultative physical examination.  Stanberry reported that he quit work in 2010.  Stanberry said that he was in constant pain.  The pain was in his back and radiated into his right leg.  He also said that he had numbness in his right arm and numbness in his right thumb and index finger.  Stanberry said that he hurt his back in 2006 and 2010.  He took hydrocodone for the pain.  He rated his pain as a 6 out of 10.  Stanberry said that he could not do any physical activity.  He could not walk far or sit for long periods.  He reported that he had nerve damage in his right arm and degenerative disc disease.  R. 356.

Dr. Chapa said that Stanberry had a history of right knee surgery, surgery on a broken right forearm, and surgery on a right leg with compartment syndrome.  R. 356.

On examination, Stanberry could ambulate without assistive devices, and his gait was normal.  Stanberry's right thigh was five centimeters smaller in circumference than his left.  Stanberry's motor strength was 5/5 in both upper and lower extremities.  Stanberry had decreased pinprick sensation in his right leg.  His ankle reflexes were absent and he had a bone deformity in his right knee.  The right knee joint was stable.  He had no joint redness or heat.  Stanberry's grip strength was 5/5 bilaterally.  He could perform fine and gross manipulations.  Stanberry had limited range of motion in his lumbosacral spine.  Straight leg testing was negative. Stanberry had limited range of motion in his right knee, but full range of motion in all other joints.  He had no difficulty getting on and off the examination table.  R. 357-58.  He had moderate difficulty tandem walking and walking on his heels and on his toes.  R. 361.

On December 3, 2013, state agency physician Dr. Calixto Aquino, M.D., prepared a Physical Residual Functional Capacity Assessment of Stanberry.  R. 91-92.  Dr. Aquino opined that Stanberry could:  occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk for six hours

in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; and never climb rope, ladders, or scaffolds.  R. 91-92.

On February 14, 2014, Dr. Johnston completed a form entitled "Social Security Medical Assessment."[3]  R. 368.  Dr. Johnston said he treated Stanberry for right arm pain after an accident and also for back pain.  Dr. Johnston said Stanberry's prognosis was guarded.  Stanberry's symptoms were back pain, back weakness, and nerve pain down the right leg.  Dr. Johnston quoted Stanberry as reporting that his back "feels loose."  R. 363.  Dr. Johnston said Stanberry's diagnosed condition could reasonably be expected to produce these types of symptoms.  One portion on the form stated, "Please identify your clinical findings and objective signs of the conditions that have been diagnosed."  Dr. Johnston responded, "There are no specific physical".  R. 364.  Dr. Johnston stated that "Patient Reported" feeling constant pain and that he was incapable of even low stress.  R. 364.  Dr. Johnston said Stanberry could ambulate without the use of assistive devices.  R. 364.

---

[3] The form does not appear to be produced by the Social Security Administration.  The source of the form is unclear from the record.

Dr. Johnston indicated that Stanberry's pain symptoms would render him unable to maintain persistence and pace to work. Dr. Johnston indicated that Stanberry could not work part-time. Dr. Johnston stated that Stanberry's symptoms markedly interfered with his ability to perform daily activities. Dr. Johnston said that physical activity, movement, temperature extremes, work stress, and static positioning would exacerbate Stanberry's symptoms. Dr. Johnston said Stanberry would need to lie down during the day to reduce symptoms. R. 365. Dr. Johnston said Stanberry would miss work four times a month due to his symptoms. Dr. Johnston said Stanberry's symptoms of fatigue due to his impairments would severely impair his ability to work. Dr. Johnston said during a workday, Stanberry would need 4 breaks and a lunch break, each for 30 minutes. R. 366.

Dr. Johnston said that Stanberry could occasionally lift 10 pounds and never lift anything heavier than 10 pounds. R. 366. Dr. Johnston stated that Stanberry could walk 3 to 4 city blocks without a rest, stand for 10 minutes, and sit for 15 minutes. Dr. Johnston said Stanberry would need a job in which he could change positions every 10 minutes. Dr. Johnston said that Stanberry would need to elevate his legs 20 percent of the time at work. Dr. Johnston said Stanberry could frequently grasp firmly and grasp finely with his left hand; occasionally grasp firmly and finely with his right

hand; occasionally bend, kneel, reach, rotate his neck, and flex his neck; and never twist, stoop, climb, crouch, crawl, pull, push, work overhead, and walk up inclines.  R. 367.  Dr. Johnston stated that Stanberry could sit for 2 hours, stand/walk for 2 hours in an eight-hour workday.  Dr. Johnston said that Stanberry could not perform repetitive tasks with his upper extremities, did not have good manual dexterity bilaterally, could not handle small objects with both hands, and could not use his hands and fingers for repetitive actions.  R. 368.

On February 20, 2014, psychiatrist Dr. Obul Reddy, M.D., completed a form entitled Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment.  R. 370-73.  Dr. Reddy treated Stanberry for ADD.  R. 414; see R. 411-15.  Dr. Reddy opined on the February 20, 2014 form that Stanberry was mildly limited in: remembering locations and work-like settings; understanding, remembering, and carrying out very short, simple one or two-step instructions; performing simple one and two-step tasks; making simple work-related decisions; interacting with the general public; and asking simple questions or requesting assistance from supervisors.  Dr. Reddy opined that Stanberry was moderately limited in maintaining concentration for extended periods, performing within a schedule and maintaining regular

attendance at work, accepting instructions and responding to criticism from supervisors, responding to changes in the work setting, and setting realistic goals or to make plans independently.  Dr. Reddy said Stanberry was markedly limited in understanding; remembering and carrying out detailed instructions; working in proximity to others without being unduly distracted; completing a normal workweek without interruptions due to psychologically-based symptoms; getting along with co-workers without unduly distracting them; and maintaining socially appropriate behavior, hygiene, and appearance.  R. 370-72.  Dr. Reddy opined that work-related stressors would increase Stanberry's functional limitations due to his psychological impairments.  Dr. Reddy opined that Stanberry would miss work more than three or four times a month due to his medically determinable impairments. R. 373.

On July 14, 2014, state agency psychologist Dr. Donald Henson, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Stanberry.  R. 103-05, 108-10.  Dr. Henson opined that Stanberry's mental impairments caused mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence,

or pace; and no repeated episodes of decompensation, each of extended

duration.  R. 104-05.  Dr. Henson further opined:

> Claimant is able to understand and remember simple and some
> detailed instructions. However, his difficulties at times with
> focus and panic symptomatology would limit claimant carrying
> out and persisting to completion only simple, repetitive tasks
> consistently. Claimant would be capable of customary
> superficial workplace contacts. Claimant would do best with a
> relatively static work environment where the task expectations
> were straightforward and posed no more than ordinary levels of
> day-to-day work stress.

R. 110.

On July 24, 2014, state agency physician Dr. B. Rock Oh, M.D.

prepared a Physical Residual Functional Capacity Assessment.  R. 107-08.

Dr. Oh opined that Stanberry could:  occasionally lift 20 pounds and

frequently lift 10 pounds; stand and/or walk for six hours in an eight-hour

workday; sit for six hours in an eight-hour workday; occasionally climb

stairs and ramps, balance, stoop, kneel, crouch, and crawl; and never climb

ropes, ladders, or scaffolds.  R. 107-08.

On October 17, 2014, Stanberry saw Dr. Johnston.  R. 434-36.

Stanberry reported low back pain and decreased range of motion in his

back.  He reported that opioid analgesics controlled the pain. R. 434.  On

examination, Stanberry's gait was normal; his joints, bones, and muscles

were normal; and his reflexes and sensations were normal. Dr. Johnston encouraged Stanberry to exercise regularly. R. 436.

On February 11, 2015, Stanberry saw psychiatrist Dr. Khondakar Hasanat, M.D. to refill his prescriptions. R. 406-09. Dr. Hasanat assigned a GAF score of 65. A GAF score of 61 to 70 indicated "some mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well . . . ." DSM-IV-TR, at 34. Stanberry reported depression and anxiety. Stanberry said he did not have panic attacks. R.407. On examination, Stanberry's insight and judgment were fair; his affect was pleasant; his mood was dysphoric; and his thought process was linear and goal directed. R. 408-09. Dr. Hasanat noted, "There are significant discrepancy and distortions in his reporting." R. 409.

On April 15, 2015, Stanberry saw Dr. Edward Trudeau, M.D., for an EMG/nerve conduction study. R. 388-95. Dr. Trudeau found that Stanberry had S1 radiculopathy, moderately severe on the right and mild on the left; L5 radiculopathy, mild to moderate in testing terms; posterior tibial neuropathy, mild in testing terms; and saphenous neuropathy, severe in testing terms. The saphenous neuropathy was expected based on his

surgical history.  Dr. Trudeau found no evidence of entrapment neuropathy
or other radiculopathies.  R. 392.  Dr. Trudeau also stated in his report:

> This is a pretty tough situation to deal with, since he is almost at
> this point as we understand it unemployable since the only jobs
> that he would be qualified for tend to be more heavy lifting jobs
> or physical jobs and this gentleman is barely able to function,
> as we understand it, through the course of his normal activities,
> just simply with his back and his lower extremity difficulties . . . .

R. 390.

On June 1, 2015, pain specialist Dr. Ferdinand Salvacion, M.D.,
administered a round of lumbar facet block injections bilaterally on
Stanberry at L3, L4, and L5.  Stanberry reported good relief from such
injections in the past.  R. 469.

On July 15, 2015, Dr. Salvacion administered a second round of
lumbar facet block injections bilaterally on Stanberry at L3, L4, and L5.
Stanberry reported good relief from the first set of injections.  R. 460.

## THE FIRST EVIDENTIARY HEARING

On December 7, 2015, an Administrative Law Judge (ALJ) held an
evidentiary hearing.  R. 39-83.  Stanberry appeared in person and with his
attorney.  R. 39.[4]

---

[4] Vocational expert Dr. James Lanier, Ph.D., also appeared.  R. 39.  The Court does not discuss Dr.
Lanier's testimony because his opinions were not considered in the decision after remand.

Stanberry testified that he lived in a one-story house with his wife and two children.  The home had a basement. Stanberry said he used to go into the basement to do laundry, but he did not go into the basement anymore because their washing machine was broken.  R. 45-46. Stanberry said that he finished high school and studied graphic arts at a vocational school.  He worked in graphic arts for a time, but his job became obsolete.  R. 46-47. He had a driver's license and drove on a regular basis.  R. 46.  He could not drive for more than a half an hour at one time.  He became really uncomfortable sitting for longer than 30 minutes while driving.  He said that he would need to stand up after 30 minutes of driving.  R. 68.

Stanberry used to work as a truck driver and laborer for the City of Springfield, Illinois (City).  He stopped working when his job position was terminated.  He said that the City both fired him and terminated his position. He said he was fired because he used too much sick time.  R. 47-48. Stanberry said he did not go to work elsewhere because he could not find a job that he was able to perform.  R. 48-49.

Stanberry said he took care of his children and the house "as much as possible."  He did laundry until the washing machine broke.  R. 49. Stanberry said he did not carry the laundry up or downstairs.  His son carried the laundry.  He only put the clothes in and took the clothes out of

the washing machine.  R. 68.  He prepared dinner sometimes and he tried to keep the kitchen clean.  His wife vacuumed and made the beds.  R. 49-50.

Stanberry said he spent much of each day lying down because of his back pain.  He watched television, took his children to school and his wife to work, and picked them up after school and work.  R. 50.  He said that driving his wife and children to school and work took about 45 minutes. Once he got home, he had to rest before doing chores.  R. 72.  He also ran errands.  He said his wife did the grocery shopping.  R. 50.  Stanberry said that his son mowed the lawn and shoveled snow in the winter.  R. 52.

Stanberry said that he did not have a computer.  He played video games on his phone and spent time on Facebook.  R. 50-51.  He did not go out to socialize and he could not afford to go out to eat.  R. 53.   He used to go to the park with his daughter, but he was not able to go to the park anymore.  He also used to go out to the movies and shopping at the mall. R. 68-69.

Stanberry said that he felt sluggish most of the time.  He said he did not sleep well.  He woke up during the night.  He took naps in the afternoon every day.  R. 73.

Stanberry said that he took care of the children in the summertime when school was out.  His daughter played with the neighborhood children. Stanberry said that his son was 20 and had ADHD and high functioning Asperger's.  Stanberry said his son stayed around the house and was afraid to drive.  Stanberry said that he took his children to appointments and activities.  His mother-in-law sometimes took the children to appointments and activities.  R. 51.

Stanberry said he had lower back pain that shot down his right leg. He also had pain in his right wrist, hand, and fingers.  He also had pain in his knees.  He had arthritis in his knees.  Stanberry said that he had been in an automobile accident when he was in high school.  He severely injured his right leg in the accident and developed the arthritis after the accident. R. 54.  He said that he still got swelling in his right leg as a result of the accident.  His right ankle swelled daily if he did not have his feet elevated. R. 55.  The swelling did not affect his ability to work as a truck driver.  He elevated his foot after work, and he wore a compression sock on his right leg. Stanberry said his doctor recommended wearing the compression sock.  He stopped wearing the compression sock on his right leg after he stopped working.  R. 56.

Stanberry said his wrist hurt after he shattered his ulna bone in his arm while he worked for the City of Springfield.  Stanberry said he still had nerve damage and numbness in his fingers.  He said that he had the numbness ever since the injury.  He said the numbness was constant. Stanberry said he was able to work through the numbness after he healed from the ulna bone break.  He said that he was not as effective at work after he broke his arm.  R. 57.

Stanberry also said that he suffered from depression and anxiety.  He had trouble talking to anyone other than his family members.  He said he did not know what to say.  He said he had social anxiety and felt anxious as he was testifying.  Stanberry also said that he had trouble concentrating. He had racing thoughts that interfered with his ability to talk.  He could not sit and read a book anymore because of his inability to concentrate.  He said he last read a book when he was in his mid-20s.  He played video games with his son. R. 63-67, 73.

Stanberry opined that he could stand for 20 minutes; walk a city block; sit for 20 to 30 minutes; and lift 10 to 15 pounds.  Stanberry said he could not be up either standing or walking for more than 30 minutes.  After 30 minutes, he needed to sit down.  R. 70-72.  Stanberry's testimony then ended.

On January 19, 2016, the ALJ issued her decision that Stanberry was not disabled.  R. 22-34.  Pursuant to the parties' stipulation in the 2017 Action, R. 609-10, this Court reversed and remanded that decision for further proceedings.  R. 607-08, 2017 Action, Order entered October 19, 2017.  On December 6, 2017, the Social Security Appeals Council remanded the matter for further consideration by the ALJ.  R. 614-16.  Stanberry thereafter submitted additional evidence.

### ADDITIONAL MEDICAL EVIDENCE

### AFTER FIRST EVIDENTIARY HEARING

On January 22, 2016, Stanberry saw mental health nurse practitioner Anne Greenwalt, MSN, RN, PMHNP-BC, for an evaluation and new prescriptions.  Stanberry reported symptoms of hopelessness, worthlessness, occasional paranoia, impaired focus, difficulty completing tasks, and difficulty concentrating.  He said he was easily distracted and forgetful.  He was off his medications for a year.  R. 814, 816.  On examination, Stanberry had a euthymic, calm mood and an appropriate affect.  His speech was normal.  His thought processes were intact, and he had no delusions or hallucinations.  R. 815.  Greenwalt renewed Stanberry's prescriptions for ADD and added a trial of an antianxiety medication and recommended counseling.  R. 816.

On February 26, 2016, Stanberry saw nurse practitioner Greenwalt. Stanberry reported that he had trouble sleeping.  Greenwalt increased the dosage of one of his ADD medications - Adderall. Stanberry's insight was good, and his appearance was appropriate. R. 813.

On April 29, 2016, Stanberry saw Greenwalt.  Stanberry still reported problems sleeping.  Stanberry's appearance was appropriate, and his insight was good.  Greenwalt increased the dosage on Adderall again.  R. 811.

On January 17, 2017, Dr. Salvacion saw Stanberry.  Stanberry's gait was stiff.  His range of motion in his lumbar spine was limited.  Stanberry's motor and sensory abilities were intact in his lower extremities.  Dr. Salvacion diagnosed lumbar facet arthropathy and lumbar spondylosis.  Dr. Salvacion administered lumbar facet block injections bilaterally on Stanberry at L3, L4, and L5.  R. 820.

On April 18, 2017, Stanberry saw nurse practitioner Greenwalt. Stanberry reported that he had "been alright I guess."  He was calm, cooperative, and alert.  His insight was good.  He still reported problems sleeping due to his pain.  Greenwalt continued Stanberry's medications.  R. 807.

On October 30, 2017, Stanberry saw Dr. Espinosa. On examination, Stanberry seemed depressed. Stanberry's strength in his trapezius and sternocleidomastoid muscle was intact, and Stanberry had full strength and normal bulk and tone in upper extremities. Stanberry had limited range of motion in his trunk. Dr. Espinosa stated that Stanberry had "a good amount of degenerative changes in his disc spaces." R. 776.

<u>THE SECOND EVIDENTIARY HEARING</u>

On April 23, 2018, a different ALJ conducted a second hearing in this matter. R. 535-62. Stanberry appeared with his attorney by videoconference. Vocational expert Harry Cynowa appeared by telephone. R. 537. Stanberry testified that he still lived with his wife and two children. His son was 22 and his daughter was 13. Stanberry still lived in a one-story house with a basement. Stanberry testified that he had difficulty going up and down the basement stairs. Stanberry said he completed high school, took half a semester of college, and took some vocational classes while in high school. R. 539-41.

Stanberry said that he had not worked since 2011. He stopped working because he got hurt on the job and then was fired for abuse of sick time. R. 541. Stanberry said he had been missing work often because of his back pain, depression, and anxiety. R. 552. He has not looked for

work in the last two years.  Stanberry said, "It's, it's really hard for me to get around."  R. 541.  Stanberry said that he drove daily.  R. 540. He drove his daughter to school, 15 minutes to drive to school and 15 minutes to drive back home.  R. 551.  He had difficulty driving long distances due to pain and anxiety.  The pain made his anxiety worse.  R. 540.  He considered the one hour and 15 minute drive to his parents' home to be a long drive.  R. 552.

Stanberry said that his knees and back bothered him the most physically.  He injured his back in 2006 for the first time.  He said that his back hurt all the time and the pain worsened with activity.  He said that the facet block injections worked for about two years.  The last facet block caused "extra pain, so I decided to discontinue those."  Stanberry testified that he took only gabapentin for pain.  He said the doctors took him off all other pain medication.  He said that the gabapentin helped him sleep.  R. 542.  He also took amitriptyline to help him sleep.  R. 544.  Stanberry said he went to sleep about 10:00 p.m. but woke up every two to three hours. He stayed awake 10 to 15 minutes each time he woke up.  R. 552.

Stanberry said that he had pain from arthritis in his knees, with the right worse than the left.  His knee pain was worse when he stood or walked.  He said,  "[I]f I'm sitting, reclining with my feet up, it's not too bad."

R. 543.  He said that the gabapentin did not help his knee pain.  R. 543.

Stanberry also said that he did not have much feeling in his right thumb and

index finger.  R. 543-44.  He said that he also took over-the-counter

ibuprofen.  R. 543.

Stanberry said he still had problems with depression and anxiety.  He

said the pain exacerbated his depression and anxiety.  He said that he also

became anxious in social interaction.  He said that he had depression and

anxiety before his physical issues began.  R. 545.  Stanberry said he took

Adderall in the past, but his wife lost her job and Medicaid would not pay for

it.  Stanberry said he always had problems with concentration and memory,

even as a child.  He had panic attacks sometimes when he became

stressed.  R. 545-46.

Stanberry testified that he could walk around a block but would need

to sit in a recliner and elevate his feet afterwards.  He could stand for 10 to

15 minutes, sit up straight for 20 minutes before he had to change

positions.  The heaviest thing he could carry was a basket of laundry.  R.

547-48.  He said that he could lift a gallon of milk.  R. 552-53.  He said that

reaching overhead caused "a feeling of imbalance and stretching out puts

pressure on my lower back."  Stanberry said he had problems using his

right hand and grasping small objects with his right fingers.  He had

problems squatting, kneeling, and bending.  Squatting hurt his knees and bending over hurt his back.  R. 548.

Stanberry said he played video games with his son, read, and talked to friends and relatives on Facebook.  He had problems putting on shoes and socks and leaning over the sink while shaving.  R. 549.  He said that he could carry a small basket of laundry up and down stairs.  He said that he had to hold onto the rail going downstairs.  His wife did most of the shopping and his son did the yardwork and shoveled snow.  R. 548-49.

Stanberry said he had good and bad days, but "the good days are very few and far between."  On a good day, Stanberry said he could go shopping or go out to eat.  He said he had good days about twice a month.  On a bad day, Stanberry said, "A bad day is really hard to get around; I usually take my daughter to school, but I'll have to call and have my mother-in- law to pick her up; and I just – I try to stay in my chair on that day with my legs up."  He said he had bad days two to three times a week.  R. 550.  His pain and depression caused his bad days.  He said that when he was depressed, he did not want to go out in public and he cried.  R. 554.

Vocational expert Cynowa then testified.  The ALJ asked Cynowa a hypothetical question:

> Mr. Cynowa, I'd like you to consider an individual with the
> Claimant' s age, education, and work experience. I'd like you to

assume . . . an individual who is limited to performing the exertional requirements of light work. This individual can never climb ladders, ropes, or scaffolds. I'd like you to assume this individual can climb ramps and/or stairs; balance, stoop, kneel, crouch, and/or crawl no more than occasionally.  I'd like you to assume that this individual is capable of understanding and remembering complex and/or detailed instructions, but due to deficits in concentration, persistence and pace, this individual is reasonably limited to performing simple and routine tasks on a sustained basis with only routine breaks.  I'd like you to assume that any work should not involve more than ordinary or routine changes in work setting or duties. . . .  In your opinion, could that individual perform any past work?

R. 556-57.  Cynowa opined that such a person (Hypothetical Person) could

not perform Stanberry's past work as a truck driver and laborer.  R. 557.

Cynowa opined that the Hypothetical Person could perform jobs in

the national economy.  Cynowa gave examples of hand packager, with

greater than 80,000 such jobs in the national economy; small products

assembler, with greater than 80,000 such jobs in the national economy;

and visual inspector, with greater than 80,000 such jobs in the national

economy.  Cynowa opined that all the example jobs required more than

occasional interaction with coworkers.  R. 557.

Cynowa opined that if the Hypothetical Person was also limited to

occasional interaction with coworkers and supervisors, then such a person

could perform light jobs such as assembler, packager, and inspector.

Cynowa opined that greater than 35,000 jobs existed in the national

economy for each of these three example job titles.  Cynowa opined that the Hypothetical Person could perform these three example jobs even if he needed to alternate between sitting and standing once an hour for five minutes and could stand and/or walk for four hours in an eight-hour workday.  R. 558.  The Hypothetical Person would need to stay at the workstation when he alternated from sitting to standing.  He could not perform these jobs if he had to leave the workstation.  R. 561.

Cynowa opined that the Hypothetical Person with all the described limitations could also perform certain unskilled sedentary jobs.  Cynowa listed the example jobs of bench hand with greater than 40,000 such jobs in the national economy; final assembler, with greater than 40,000 such jobs in the national economy; and sedentary inspector, with greater than 35,000 such jobs in the national economy.  R. 558-59.  The Hypothetical Person could perform these unskilled example jobs if he was limited to lifting no greater than 10 pounds occasionally.  R. 560-61.

Cynowa opined that the Hypothetical Person could miss no more than two days of work a month and remained employed.  Cynowa opined that the Hypothetical Person could not work if he was off task more than 10 to 15% percent of the time.  R. 559.

Cynowa stated that individuals performing the jobs assembler, packager, inspector, bench hand, final assembler, and sedentary inspector all work in the same room as others performing such jobs, but each performed his or her own work independently of the others. The workers did not interact while performing the work. Cynowa agreed that if the Hypothetical Person could not be in proximity to any other person at work, he could not perform these jobs. R. 560. The hearing then concluded.

## THE SECOND DECISION OF THE ALJ

On May 25, 2018, the second ALJ issued his decision on remand. R. 515-28. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing). 20 C.F.R. §§

404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Stanberry met his burden at Steps 1 and 2. Stanberry had not engaged in substantial gainful activity from June 11, 2011 until his Date Last Insured December 31, 2016, and he suffered from the severe impairments of lumbar degenerative disc disease, right knee

degenerative joint disease, history of compartment syndrome, status post

right leg surgery, obesity, affective disorder, anxiety disorder, and history of

ADD.  R. 518. The ALJ found at Step 3 that Stanberry's impairments or

combination of impairments did not meet or medically equal a Listing.  R.

518-23.

>   At Step 4, the ALJ found that Stanberry had the following RFC:
>
>   After careful consideration of the entire record, the undersigned
>   finds that, through the date last insured, the claimant had the
>   residual functional capacity to perform sedentary work as
>   defined in 20 CFR 404.1567(a) with the following non-exertional
>   limitations. He can never climb ladders, ropes, or scaffolds. He
>   can climb ramps and/or stairs, balance, stoop, kneel, crouch,
>   and/or crawl no more than occasionally.  He is capable of
>   understanding and remembering complex and/or detailed
>   instructions but due to deficits in concentration, persistence and
>   pace, he is limited to performing simple and routine tasks on a
>   sustained basis with only routine breaks.  Any work must not
>   involve more than ordinary or routine changes in work setting or
>   duties.  Any work must not involve more than occasional
>   interaction with others.

R. 523.  The ALJ relied on Stanberry's description of his daily activities, the

imaging studies, the medical examinations that found normal strength in his

extremities, normal range of motion in his extremities except for his right

knee, normal sensation, and normal ability to walk without assistive

devices.  R. 523.  The ALJ also relied on the opinions of Drs. Chapa,

Aquino, and Oh, and psychologists Drs. Kravitz and Henson.  R. 524.

The ALJ acknowledged that Drs. Trello and Hasanat gave Stanberry GAF scores of 50 and 65 respectively.  The ALJ gave the GAF scores limited weight because GAF scores were not intended to be used as an assessment of a person's ability to perform work-related functions and the American Psychiatry Association no longer recommended using GAF scores.  R. 524-25.  The ALJ also gave little weight to the opinions of Drs. Trello and Reddy.  The ALJ stated that he had reviewed hundreds of reports from Dr. Trello and she universally gave claimants GAF scores of 50.  R. 525.  The ALJ noted that Dr. Reddy had his license suspended.  Further, Dr. Reddy did not cite clinical findings to support his opinions.  R. 525.

The ALJ gave little weight to Dr. Johnston's February 14, 2014 opinions because Dr. Johnston stated that he had no specific physical findings to support the opinions and the pain assessment was based on Stanberry's report rather than objective medical findings.  The ALJ also stated that Dr. Johnston's opinions were not supported by objective medical examinations and testing in the record.  R. 526.

Based on the RFC finding, the ALJ found at Step 4 that Stanberry could not perform his past relevant work.  R. 526.  At Step 5, the ALJ found that before his Date Last Insured, Stanberry could perform a significant

number of jobs that existed in the national economy.  The ALJ relied on the

Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2,

and the opinions of vocational expert Cynowa that a person with

Stanberry's age, education, work experience, and RFC could perform the

representative sedentary jobs of bench hand, final assembler, and

inspector.  R. 527. The ALJ concluded that Stanberry was not disabled

before his Date Last Insured of December 31, 2016.  R. 528.  Stanberry

then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security

Administration no longer uses the term credibility in the evaluation of

statements regarding symptoms).  The ALJ must articulate at least

minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence.  The

ALJ's RFC finding that Stanberry could perform a limited range of

sedentary work was supported by the numerous medical examinations that

showed normal strength, normal gait, normal sensation, and normal range

of motion in his extremities except for some examinations of his right knee.

The RFC finding was supported by the opinions of Drs. Chapa, Aquino, and

Oh, and psychologists Drs. Kravitz and Henson.   The RFC finding was

supported by Stanberry's testimony that he drove daily to drop off and pick

up his wife and children, cooked meals, did the laundry, and engaged in

other daily activities.  The RFC finding was also consistent with the imaging

of his back and other testing that generally showed mild to moderate

impairments.  The RFC finding, the Guidelines, and the opinions of

vocational expert Cynowa supported the ALJ's conclusion at Step 5 that Stanberry could perform a significant number of jobs that existed in the national economy.  Substantial evidence supported the ALJ's determination that Stanberry was not disabled before his Date Last Insured.

Stanberry argues that the ALJ erred because he failed to give Dr. Johnston's February 14, 2014 opinions controlling weight in the decision. The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 404.1527(c)(2); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).[5]  The ALJ did not do so because he found Dr. Johnston did not base his opinions on objective evidence and his opinions were inconsistent with other evidence in the record.  The ALJ provided substantial evidence to support his decision.  Dr. Johnston said he had "no specific physical" to identify the clinical findings and objective signs of Stanberry's condition.  Dr. Johnston also noted that he based his opinion on Stanberry's subjective reports of Stanberry's level of pain and ability to handle any stress.  These statements by Dr. Johnston supported the ALJ's

---

[5] The Commissioner changed the regulations regarding the interpretations of medical evidence.  The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

conclusion that Dr. Johnston did not base his opinions on objective evidence, but rather on Stanberry's subjective reports.  The ALJ also concluded that Dr. Johnston's opinions were inconsistent with other evidence in the record.  Substantial evidence supported this finding. Numerous medical examinations found normal muscle tone, muscle strength, normal range of motion in extremities.  Stanberry's MRIs, x-rays, and other tests also often found either mild to moderate impairments.  The ALJ could reasonably conclude that Dr. Johnston's opinions of completely debilitating symptoms were inconsistent with these objective findings.

Stanberry argues that other objective evidence supported Dr. Johnston's opinions.  Even if some evidence in the record may have been consistent with Dr. Johnston's opinions, the ALJ still provided substantial evidence to support his conclusion that Dr. Johnston did not rely on such objective evidence and that his opinions were inconsistent with other evidence in the record.  As such, the ALJ did not err in his treatment of Dr. Johnston's opinions.

Stanberry also argues that the ALJ erred because he failed to consider Dr. Trudeau's EMG/nerve conduction results.  The Court disagrees.  The ALJ considered Dr. Trudeau's test results.  See R. 520. Stanberry argues that the ALJ should have given more weight to the 2014

EMG / nerve conduction test results of Dr. Trudeau.  The Court will not second guess the weight that the ALJ gave to a particular piece of evidence.  The Court does not reweigh the evidence.  See Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82.

Stanberry argues that the ALJ failed to even mention Dr. Trudeau's comment that Stanberry was "unemployable" because he could not perform "heavy lifting jobs" or "physical jobs."  Any error in omitting Dr. Trudeau's comment was harmless.  The ALJ is required to discuss the material evidence in the record but is not required to mention every piece of evidence.  E.g., Craft v. Astrue, 539 F.3d 668, 673 (7th Cir. 2008).  Dr. Trudeau's use of the word "unemployable" was not a medical opinion and so was not material. See 20 C.F.R. §404.1527(d)(1) and (d)(3) (No special significance given to opinions by medical providers on issues reserved to the Commissioner, such as whether a person is unable to work).

Aside from Dr. Trudeau's use of the word "unemployable," his opinion on Stanberry's functional limitations was consistent with the ALJ's decision. Dr. Trudeau said that Stanberry could not perform "heavy lifting" and "physical jobs" such as Stanberry's prior work as a truck driver and laborer. The ALJ agreed that Stanberry could not perform his prior work.  The ALJ also agreed that Stanberry could not perform heavy lifting or physical jobs

like his prior work as a laborer.  The ALJ found that Stanberry could only perform a limited range of sedentary work.  Dr. Trudeau did not opine on Stanberry's ability to perform such work.  As such, a remand to revise the ALJ's decision to address Dr. Trudeau's opinion on Stanberry's functional limitations would not change the outcome.  Any error, therefore, was harmless.  See e.g., Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (remand not appropriate unless there is reason to believe the remand will result in a different outcome).

Stanberry briefly argues in a footnote that the ALJ improperly relied on Stanberry's daily activities in making his decision.  Brief in Support of Motion for Summary Judgment (d/e 11), at 21 n.6.  The argument is waived because it is not developed properly.  See e.g., Hernandez v. Cook County Sheriff's Office, 634 F.3d 906, (7th Cir. 2011) (Skeletal arguments are properly treated as waived.).  Furthermore, the regulations require the ALJ to consider a claimant's daily activities in assessing a claimant's RFC.  20 CFR 404.1529(c)(3) and 416.929(c)(3); see SSR 16-3p, 2017 WL 5180304, at *7 (March 28, 2016, revised October 25, 2017).  The ALJ followed the regulations.  There was no error.

Stanberry did not raise other claims of error, and so, forfeited any other possible claims of error.  See e.g., Scheidler v. Indiana, 914 F.3e 535, 540 (7th Cir. 2019).

THEREFORE, THIS COURT RECOMMENDS that the Defendant Commissioner's Motion for Summary Affirmance (d/e 14) should be ALLOWED, Plaintiff Stanberry's Motion for Summary Judgment (d/e 10) should be DENIED, and the decision of the Defendant Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   December 19, 2019

_____s/ *Tom Schanzle-Haskins*_____

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE